50 CCPA

**Application of Milton E. CHANDLER and Alexander M. Wright.**

**Patent Appeal No. 6982.**

United States Court of Customs and Patent Appeals.
June 20, 1963.

A. M. Prentiss, West Hartford, Conn., for appellants.

Clarence W. Moore, Washington, D. C. (S. Wm. Cochran, Washington, D. C., of counsel), for the Commissioner.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

This is an appeal from the decision of the Board of Appeals affirming the action of the examiner rejecting claims 3 to 17, 19 to 24, 26 to 33 and 35 to 43 of appellants' application [1] for a patent on a fuel regulating apparatus for an aircraft turbojet engine. No claims have been allowed.

Appellants' application describes the claimed invention as directed to a fuel flow regulating apparatus to control the engine speed and power by regulating the fuel supply as a function of a manual control and several variables, including engine inlet air temperature and pressure, engine speed, and other engine operating conditions.

The application states, in part, that engines of the type under consideration cannot be operated at maximum speed under all flight conditions; that fuel and speed control should enable the operator to vary speed and power as conditions of flight may require; that engine speed responds to fuel flow, varying as a function of the pressure and temperature of the engine inlet air flow, engine air compressor characteristics and other operating factors; that maximum fuel flow is limited by the maximum permissible compression ratio of the air compressor which results from that fuel flow, under any combination of engine speed, engine inlet air temperature and pressure, and rate of air flow through the engine, that may obtain under varying operating conditions; that for proper regulation of engine operation, and to avoid compressor stall, burner blowout and other causes of engine failure, it is not feasible to rely upon automatic regulation of fuel flow as a function of variables which do not include these factors; that an important requirement of a satisfactory fuel and speed control is responsiveness to engine acceleration at maximum rate without causing compressor stall, and to deceleration of the engine at a maximum rate without causing burner blowout; and that another important requirement is the provision of an emergency fuel supply and control system responsive to operation in the event of

1. Serial Number 494,055 filed March 14, 1955, for "Fuel Control System."

failure of the normal fuel supply and control system.

It is stated that in turbojet engine fuel control systems in prior use, engine performance is controlled by regulating the fuel supply by a control apparatus which varies the delivery of a fuel pump by introducing correction factors which modify the delivery, in order to compensate the fuel flow for variations in pressure and temperature of the air entering the engine caused by variations in flight altitude, ambient air temperature, and other operating conditions. Applicants state that they have found that better control of engine operation can be obtained by providing a fuel control system in which inlet air pressure and temperature compensation of the fuel flow to the engine is inherent in the system, and hence, such corrective factors are not required to compensate for changing operating conditions.

More specifically, the application states the salient features of the claimed invention as follows:

"(1) A control apparatus comprising, in a single selfcontained package, a normal fuel supply and control system, and an emergency fuel supply and control system which the pilot may bring into operation in the event of failure of the normal system; each system comprising a series of component coordinated hydraulic devices for regulating fuel delivery to the engine; said devices being collectively responsive to a single manual control, to inlet air pressure and temperature, and to speed of the engine.

"(2) A control apparatus which comprises a combination of devices that measure inlet air absolute temperature and pressure, and engine speed, (rpm) and positions a main fuel metering valve, and thus varies its flow area, in accordance with a selected function of said temperature, pressure and speed; while the pressure differential across said valve is held substantially constant.

"(3) A fully automatic, hydraulic control apparatus in which the fuel flow to the engine is compensated for variations in absolute inlet air pressure and temperature, and engine speed, and said compensation is *inherent* in the operation of the apparatus, so that additional correction factors for these variables are not required in order to compensate for variations in operating conditions.

"(4) A fully automatic, hydraulic control apparatus which uses as control 'parameters,' for limiting the maximum fuel flow to the engine, the entities: inlet air pressure, and preselected functions of inlet air temperature and engine speed, as defined hereinabove.

"(5) A control apparatus which produces a substantially constant engine speed, corresponding to any selected position of a single manual control lever, under all engine operating conditions.

"(6) A control apparatus which functions so that the engine can be accelerated at a maximum rate, corresponding respectively to the pressure and temperature of the air entering the engine compressor, without causing compressor stall or excessive turbine temperature; and decelerated at a maximum rate without causing burner blowout.

"(7) A control apparatus wherein the fuel flow to the engine under normal operation is regulated by:

"(A) a substantially constant metering *head* across a variable area metering orifice; and

"(B) a metering orifice whose *area* is varied:

"(a) during engine *acceleration,* in accordance with the temperature and pressure of the air entering the engine compressor; and in accordance with engine speed, at each instant.

· "(b) during *steady state* engine operation, by centrifugal speed governor geared to the engine, whose action is responsive to the position of a manual control lever; and

"(c) during engine *deceleration,* by said governor and limited by an adjustable cam and stop.

"(8) A control apparatus wherein the fuel regulating mechanism operates in its own fluid, acts directly on the fuel supplied by a constant delivery pump, and regulates its flow to the engine by means of a plurality of suitably controlled by-pass valves.

"(9) A fuel and speed control apparatus having control devices which vary the fuel flow in accordance with variations in temperature and pressure of the ambient atmosphere, to prevent engine failure at high altitudes and low atmospheric temperatures.

"(10) A control apparatus having an override speed control device which prevents the engine from operating at excessive speeds." (Emphasis applicants'.)

Claims 3 and 40 are sufficiently illustrative and read as follows:

"3. Fuel regulating apparatus for an aircraft turbojet engine having an incorporated air compressor, comprising: a fuel feeding system having a linearly positionable fuel feed valve therein, an engine speed-responsive governor for linearly varying the position and hence varying the flow area of said valve; and means, independent of said governor and responsive to variations in the pressure of the air entering said compressor, for modifying the linear positioning by said governor of said valve in accordance with said pressure, under all operating conditions of said engine, without changing the simultaneous position of said governor.

"40. An aircraft turbojet engine fuel control apparatus comprising: a conduit supplying fuel to said engine, a metering restriction in said conduit, first linearly movable means for varying the flow area through said restriction, second manually-operable means, and third engine speed-responsive means, for varying the linear position of said first means; fourth cam means reversibly positionable in two different directions and having a warped surface, for limiting the action of said second means on said first means, without changing the position of said third means; fifth means, responsive to engine induction air temperature, for varying the adjustment of said fourth means in one direction, as a preselected function of said temperature; sixth means, responsive to said third means, for varying the adjustment of said fourth means, in the other direction, as a preselected function of engine speed; and seventh means for varying the position of said first means, independently of the action of said third, fourth, fifth and sixth means, in accordance with a preselected function of engine induction air pressure; whereby the fuel flow to said engine is conjointly controlled in accordance with the position of said second means, engine speed, and said functions of said temperature and pressure.

The references relied upon are:

| | | |
|---|---|---|
| Davies et al. | 2,674,847 | April 13, 1954 |
| Kunz | 2,720,751 | October 18, 1955 |
| Fox | 2,836,957 | June 3, 1958 |

The Board of Appeals affirmed the rejection by the examiner of claims 3 to 8, 10, 11, 13 to 17, 19 to 23, 26 to 33, 35, 36, and 39 to 43 as unpatentable over Kunz in view of Davies et al.; of claim 9 as unpatentable over Kunz; of claims 3, 5 to 8, 10, 12, 14 to 17, 19, 20, 26 to 29, 31 to 33, 35, 36 and 39 to 43 as unpatentable over Fox in view of Davies et al.; and of all of the claims on the ground of undue multiplicity.

In aid of analysis and correlation of the cited references to the relevant features of appellants' claimed invention, we reproduce the following figures from the drawings:

Fig. 1.

Davies et al.  Figure 1.

Figures 2 and 3

Kunz

FIG. 1

Fox    Figure 1.

Fox    Figure 1.

Davies et al. discloses an engine fuel supply control apparatus in which fuel flows from tank 16 through filter 14 by means of line 13 through engine driven variable delivery pump 10, through line 17 to flow restricting valve 34, through control valve 42 to burner 21. Movement of diaphragms 29 and 37 positioned on opposing sides of valve 34 activates that valve. A pressure change occurs across metering orifice 25 which is proportional to the square of the engine rotational speed. This pressure difference is also applied to diaphragm 43 causing partial rotation of valve 42 linked with means 49, 50, 51 controlling fuel flow automatically in response to engine speed. Valve 42 is reciprocated in response to changes in atmospheric pressure by piston 55. Flow through passage 56 tends to neutralize pressure difference in the chambers on either side of piston 55 and is controlled by the valving action of rod 57 attached to bellows 58. Bellows 58 expands and contracts in response to atmospheric pressure. The patent also shows a variable atmospheric temperature sensitive capsule or orifice.

Kunz discloses an apparatus comprising a sleeve valve 27 for controlling the flow of fuel from source 16 to conduit 28' leading to a gas turbine engine. Valve 27 is provided with metering orifices 27' contoured to obtain a predetermined rate of flow for each increment of linear travel. Regulator 15 maintains a constant pressure differential across valve 27. Metering valve 27 is positioned axially by engine driven governor 200. It is manually reciprocated by control 212. A deceleration limiting member 234 to reduce fuel feed to prevent die-out and an acceleration limiting member 238 to prevent dangerously high burner temperature and burner blowout are disclosed. The acceleration and deceleration limits on the rate of fuel feed "are being continually revised as a function of altitude or changes in entering air pressure and temperature due to the action of the capsule or bellows 92', and also as a function of surge by the action of the temperature responsive bellows 246.

"The cams 55, 56 and 57 are contoured to permit maximum acceleration without producing dangerously high burner temperatures, surge or hot blowout, while the deceleration cam is contoured to limit the rate of deceleration to prevent burner die-out."

Fox discloses a gas turbine fuel control in which fuel flows through conduit 24 to pump 20, then to pump 22, and through conduit 42 to the interior of sleeve valve member 70. The sleeve 70 is adapted to be moved axially and to be rotated for varying the port area between the aligned ports 66 and 68. It is the flow through this port area that determines the permissible maximum fuel flow at any transient operating condition. The flow proceeds through orifices in inner sleeve 212, sleeve 70 and liner 64, respectively, through conduits 48 and 52 to fuel dump valve 54, through conduit 56 to pressurizing valve 60, then through conduit 392 to burner 10. Sleeve 70 rotates in response to changes in compressor discharge pressure and is accomplished through a rack 72 engaging with a pinion 74 formed on the end of the sleeve. The rack is moved through a servomotor 76 which is controlled by compressor discharge pressure. For sensing discharge pressure within the compressor there is a pressure tap 78 connected by duct to a pressure sensing bellows 82. The position of cam 102 is axially controlled by the turbine speed by means of a speed signal generator 114 which indicates speed as a pressure function. Cam 102 is rotated in response to pressure inlet temperature as sensed in chamber 174 which communicates with the compressor inlet through passages 178 and 182. Inner sleeve 212 is reciprocated by movements of cam 276 transmitted through follower 274 and servo mechanism 270 to act with sleeve valve 70 to control the passage of fuel through the ports in sleeve 70. Cam 276 is translated horizontally by hydraulic pressure proportional to turbine speed as signaled by speed signal generation through passage 284 and is rotated by manual control 290.

The board sustained the examiner's rejection of claims 3 to 8, 10, 11, 13 to 17, 19 to 23, 26 to 33, 35, 36 and 39 to 43 as unpatentable over Kunz in view of Davies et al. From this group the board selected claims 3, 4, 5 and 6 for specific discussion.

Appellants analyze claim 3 as calling for three elements in the fuel feed system:

"1. a linearly positionable valve;

"2. an engine speed-responsive governor for linearly varying the position of the valve;

"3. means, independent of the governor, responsive to variations in the pressure of air entering the engine compressor for modifying the linear positioning by the governor of the valve in accordance with said pressure, under all operating conditions, without changing the simultaneous position of the governor."

Kunz discloses valve 27 linearly positional to control fuel flow by speed responsive governor 200. Davis et al. shows an inlet air pressure responsive bellows 58 which, when expanded, closes passageway 56 and servo pressure is built up in the cylinder space causing piston 55 to adjust the position of the valve 42 until a balanced position is reached. Contraction of the bellows opens passageway 56 equalizing pressures on both sides of the piston 55, so that slide valve 42 moves to follow up the movement of rod 57. Davies et al. would seem clearly to suggest adding to Kunz a pressure responsive means to function in controlling the operation of valve 27. Davies et al. teaches that the pressure responsive device would be operative "under all operating conditions." In the Davies et al. device valve 42 is rotated to control fuel flow automatically in response to engine speed. Movements of diaphragm 43 cause a corresponding rotational movement of valve 42. The engagement of the cross head 52 in slots 53, however, leaves valve 42 free for axial movement in response to pressure changes independently of the rotative movements in response to speed.

In Kunz it is noted that governor 215 and bellows 92' act independently on follower 75 to position linearly member 234. Neither the governor nor the bellows affects the operation of the other. It seems obvious that both Kunz and Davies et al. suggest the execution of the combination so that the pressure responsive means will act independently of the governor without changing the position of the latter.

We are constrained to agree with the board that:

" * * * only an obvious matter of choice and design would be involved in having the speed control 205 of Kunz and the bellows 58 of Davies et al. conjointly and independently control the linear positioning of valve member 27 of Kunz. Further, if any further suggestion for so combining the separate controls as indicated above, is required, it is provided by the controls of valve member 70 of Fox, who has member 70 linearly positioned conjointly and independently in the same sense that appellants' speed governor 165 and temperature control 30 or pressure control 32, conjointly and independently control valve 61."

Claim 4 distinguishes from claim 3 only in calling for air temperature responsive control.

Kunz discloses bellows 246, tube 247 and bulb 248 which may be loaded with a suitable fluid responsive to changes in temperature which assists in controlling the position of limiting member 238.

Davies et al. discloses a temperature responsive means whereby a capsule modifies the pressure drop across a restricted orifice in accordance with ambient temperature. The fuel flow is increased on reduction in ambient temperature and decreased on increase of said temperature.

We note that while the motion of cam 102 in Fox is a direct function of the

speed of the turbine causing valve 70 to move axially with the slope of the cam, this cam is also caused to rotate in response to compressor inlet temperature. It is apparent that valve 70 is moved angularly as a function of compressor discharge pressure and is moved axially as a function of both turbine speed and compressor inlet temperature.

The references clearly satisfy the limitation of claim 4.

Claim 5 distinguishes over claims 3 and 4 in that it calls for means responsive to variations in pressure and temperature.

Kunz discloses that during engine operation "the acceleration and deceleration limits on the rate of fuel feed are being continually revised as a function of altitude or changes in entering *air pressure and temperature* due to the action of * * * bellows 92', and also as a function of surge by the action of the temperature responsive bellows 246." (Emphasis added.)

As heretofore noted, Fox discloses temperature responsive means in elements 162 to 182. Fox also discloses pressure means through elements 72 to 90, both means functioning independently to control the positioning of valve 70. Fox discloses pressure means for controlling the rotational position of valve 70, and temperature controlled means and speed controlled means for conjointly and independently controlling the linear positioning of valve 70.

In view of the teachings of these references, we think the board reached a sound conclusion that:

"* * * both Kunz and Fox teach mechanism for conjointly and independently operating a single member from two or more controlled devices for modifying fuel supply to an engine according to preselected conditions."

Claim 6 adds to claim 5 a limitation to "means for automatically maintaining a constant pressure drop across said restriction."

Kunz discloses that the head across the metering valve 27 is maintained substantially constant by regulator 15 and that said valve will meter fuel in direct relation to the area of the graduated orifices 27'.

Fox discloses that the pressure drop through the orifice is controlled by a bypass valve in the form of a plunger 296 to bore 298. The limitation is clearly satisfied by the references.

In affirming the rejection of claims 7, 8, 10, 11, 13 to 17, 19 to 23, 26 to 33, 35, 36 and 39 to 43 as unpatentable over Kunz in view of Davies et al., the board stated:

"In view of the above described valve control of Kunz and Fox and further in view of the use by each, of cam means having a warped surface as specified in claim 28, for instance, for providing the conjoint and independent control of the fuel valve, we are of the opinion that the particular combination of condition responsive elements selected for such conjoint and independent control is an obvious, unpatentable matter of choice, particularly when, as here, each condition responsive means, per se, is old in a fuel control system."

The solicitor contends that this group of claims is directed to combinations of elements essentially similar to those called for in claims 3 to 6 or in which differ therefrom in ways that obviously present no different issue of patentability. We agree.

Claims 7, 8, 11, 13, 14, 16, 17, 19, 20, 21, 22, 23, 27, 30, 31, 32, 33, 35, 36, 39, 40, 41 and 42 call for manual control for the fuel control valve.

Kunz teaches that acceleration would be accomplished by manually moving lever 212 in a given direction which in cooperation with stated means would move valve 27 to increase the rate of fuel feed. Davies et al. discloses element 48 as a manually operable throttle or lever designed to function with the valve

to regulate fuel flow. Fox shows manually operable fuel control lever 290.

Claims 28 to 30, 36, 39 and 40 call for a warped surface cam as part of the control mechanism.

Kunz shows deceleration cam 55, acceleration cam 56 and surge cam 57 all as having warped or contoured surfaces and operable as part of the control mechanism. Fox shows two three dimensional cams with warped or contoured surfaces operable as part of the fuel control system.

Claims 35 and 41 are limited to the use of servomotors to operate the valve.

Davies et al. discloses a servomechanism which operates in conjunction with slide valve 42. Fox shows servomotor 76 which is controlled by compressor discharge pressure, also follower servomotors 96, 166 and 270, all of which function in the operation of valve 70.

Claim 9 embodies the requirement that the means for automatically modifying the positioning effect of the speed responsive means shall do so "without changing the position" of the speed responsive means. The examiner rejected the claim as fully met by Kunz. The board sustained the rejection stating, however, that it observed a "slight difference in structure" between that claimed and that of Kunz and concluding that such difference was no more than an obvious matter of choice and unpatentable. The board noted that Fox discloses a manual control means and speed control means conjointly and independently controlling valve element 212 in its linear movement and also a spring 248 allowing linear movement of valve 218 independent of governor 230 during speed reduction.

Relative to Kunz, the board stated that the reference teaches:

" * * * a mechanical means for connecting separate actuating means for conjointly but independently modifying the linear position of a valve control member so that to broadly, as claimed, provide such a means between lever 212, governor

201, members 234 and 238 and valve 27 would be merely carrying forward of the common teachings of these patents and unpatentable."

In view of the teachings of the cited references in their application to claim 9 and the obvious fact that mechanical arrangements for applying the control effect of independently operating condition responsive devices are old in both Kunz and Fox, we are constrained to hold that provision of such a means in Kunz which would control valve 27 without affecting the movement of governor 200 would be obvious to one skilled in the art.

The board sustained the examiner's rejection of claims 4, 9, 11, 13, 21 and 30 as being unpatentable over Fox.

These claims relate to engine speed and the temperature of the air in the inlet as the conditions sensed for the control of the fuel flow.

We have heretofore noted Davies et al. teaches that the movement of valve 42 is under control of capsule 58 independently of the rotational movement of the valve by the hydraulic governor and that these means function with correlated means to vary fuel flow in accordance with altitude to maintain a particular engine rotational speed. Fox teaches that his valve 70 is moved in response to temperature changes in the compressor inlet temperature, compressor discharge pressure and to changes in speed of the gas turbine rotor. It would seem obvious, therefore, to control the Fox valve in accordance with the teachings of Davies et al.

The board sustained the examiner's rejection of claims 3, 5 to 8, 10, 12, 14 to 17, 19, 20, 26 to 29, 31 to 33, 35, 36 and 39 to 43 as unpatentable over Fox in view of Davies et al. This group of claims relates to ambient pressure as a condition sensed for fuel control.

As above noted, the Fox valve 70 responds to temperature, pressure and speed. Fox also shows inner sleeve 212 located within sleeve 70. These two parts move independently of each other

by various condition-sensitive devices to regulate fuel flow. By sacrificing the additional functions performed by sleeve 212, it would be an obvious expedient of simplification to use a single valve element in Fox to control fuel flow. It would be just as obvious to adapt one or more of the control devices used to operate element 70 to function in positioning member 212, thus eliminating element 70.

In sustaining the examiner's rejection of claims 7, 8, 10, 11, 13 to 17, 19 to 23, 26 to 33, 35, 36 and 39 to 43 on Kunz in view of Davies et al., the board held, as hereinabove noted, that the combination of condition responsive elements disclosed by appellants constituted an obvious, unpatentable matter of choice, "particularly when, as here, each condition responsive means, per se, is old in a fuel control system."

Appellants contend that their particular novel combination of elements was not an obvious unpatentable choice of means, nothwithstanding the means may be severally old in the art, as evidenced by efforts of those skilled in the art to achieve appellants' invention and that the claimed fuel controls have been adopted by the Government as standard equipment.

█ Insofar as disclosed by the record, the assertion relating to the Government's adoption and use is made here for the first time. Since this averment, allegedly supported by the document in "Appendix A," referred to as an official U. S. Government publication, was not before the tribunal below for its consideration, we will not consider it. In re Reese, 48 CCPA 1015, 290 F.2d 839. The record is devoid of proof to support appellants' assertion that the results obtained "by actual use" of the claimed fuel controls have been "long sought by those skilled in the art," but have eluded achievement.

The crux of appellants' contention is that "the *particular combination* selected for conjoint and independent control of the fuel valve determine the *control para-*

*meters* that are used to regulate the fuel flow to the engine, \* \* \* and these in turn constitute the inventive *concept* and *heart* of the *invention,* which resides in such *combination* of elements." (Emphasis appellants'.)

Supplementary to the cases cited in their brief, appellants in oral presentation before us cited the following cases: In re Sporck, 49 CCPA 1039, 301 F.2d 686. In re Irmscher, 46 CCPA 761, 262 F.2d 85. In re Gruskin, 43 CCPA 962, 234 F.2d 493. In re Bascom, 43 CCPA 837, 230 F.2d 612. In re Shaffer, 43 CCPA 758, 229 F.2d 476. In re Demarche, 42 CCPA 793, 219 F.2d 952. In re Carter, 41 CCPA 851, 212 F.2d 189.

We shall discuss these cases insofar as they may be relevant to the factual and legal aspects of the instant case.

The sole issue in In re Sporck, supra, as is the primary issue here, was one of obviousness under 35 U.S.C. § 103. The majority held that neither the record nor the facts judicially noticeable supplied the factual data necessary to support the legal conclusion of obviousness at the time the invention was made without substitution and hindsight appraisal of the prior art for such factual data. The majority found doubt as to the factual basis supporting the conclusion of the board, and resolved such doubt in favor of the applicant. It was observed that the change productive of the invention was admittedly simple and that it was easy to see how, by hindsight, the references could be modified and manipulated to produce the invention. The majority further observed that "If those skilled in the mechanical arts are working in a given field and have failed to discover a certain new and useful improvement, the one who first makes the discovery frequently has done more than make an obvious improvement which would have suggested itself to a mechanic skilled in the art, and such an invention is entitled to the grant of a patent thereon." The two dissenting opinions supported the board's finding of obviousness, one dissent observing that the record did not show that anyone had ever

tried or wanted to do what the appellant did.

In our view there is a vast difference in the sufficiency of the factual basis, upon which to predicate a conclusion of obviousness, between the instant case and Sporck. In our judgment the cited references here, without resort to the expediency of hindsight, embody relevant elements and means which would suggest to one skilled in the art appellants' claimed invention.

In re Irmscher, supra, reaffirms the well settled proposition of law that the mere fact that individual steps are taught by several references does not of itself negative patentability but that it must still be determined whether the combination of steps would have been obvious to a worker of ordinary skill in the art. The court found that although a reference taught a certain relevant step and another disclosed a relevant step, it would be impossible to apply these teachings to the primary reference patent without entirely changing the basic mechanism and procedure thereof, holding that "Such a material and radical modification of the prior art would be contrary to the teaching of the primary reference * * *, and could be made only with the assistance of appellant's disclosure," and citing In re Demarche, supra, and In re Shaffer, supra.

In our consideration of the claims in issue, the interchangeability of the various means and elements of the cited references, their coordination of functions and adaptability of means and mechanisms, we have observed neither instance of nor need for a "material and radical modification of the prior art" contrary to the teaching of any reference. It seems clear to us that the references disclose features analogous to those claimed which would render the claimed combination obvious to one skilled in the art.

In In re Bascom, supra, it was contended that a hypothetical combination based on a principal reference in view of secondary references required extensive modification of the individual features of each of them and was not permissible. The court held that the proper inquiry should not be limited to the "specific structure shown by the references, but should be into the concepts fairly contained therein, and the overriding question to be determined . is whether those concepts would suggest to one skilled in the art the modification called for by the claims."

We find here not only analogy of structure in the references to the claims but analogy of concepts and in our opinion these concepts would suggest to one skilled in the art the claimed combination.

In In re Shaffer, supra, the court found that appellant recognized a problem inherent in the titration of fluids with the use of conventional apparatus. To overcome the problem, which was not recognized in the prior art, appellant combined elements, all old in the art, and since the combination of elements evidenced the discovery and solution of a theretofore unknown problem to produce a new, unobvious, and unexpected result, namely improved titration, appellant had met the tests for patentability. The court correctly applied the law as properly stated to the factual situation presented, which was, that in neither of the cited references was there any teaching which would suggest that they could be combined for the purpose of producing a more accurate titration. As we have noted, the references in the instant case clearly suggest various combinations to produce obvious results consonant with appellants' disclosure.

We have examined In re Demarche, supra, and In re Carter, supra, and find them merely cumulative and adding nothing of significant import to the preceding cases cited by appellants.

We are of the opinion, for the reasons stated, that the combination of condition responsive elements disclosed by appellants for their conjoint and independent control of the fuel feed valve would, in view of the cited references, be obvious to one skilled in the art.

The board sustained the rejection by the examiner on prior art of all the claims in issue with the exception of claim 37 which is directed to the modification of governor control by "a seventh contoured cam means." The board found that such means was not disclosed in the references. In addition, the examiner stated claims 24 and 38 were allowable over the prior art.

We are confronted with the issue of undue multiplicity of claims raised by the board's affirmance of the examiner's rejection of all the claims on this ground. As apposite precedent for this action, the board cited In re Chandler, 45 CCPA 911, 254 F.2d 396.

The examiner held that, in view of the state of the art, thirty-eight claims are not justified and serve to confuse rather than to define the invention, since many of the claims differ from each other in no material aspect, pointing out that:

" * * * claims 3, 7, 9, 10, 15 and 20 differ from each other only in the recitation of such conventional elements as manual means and constant pressure regulating valves; for instance, manual means 212 and regulator 15 of Kunz, manual means 48 and regulator 34 of Davies et al and manual means 290 and regulator 296 of Fox. Claims 4, 11, 13, 17 and 21 differ from each other only by the recitation of conventional manual means and constant pressure regulating valves. Claims 5, 12, 19, 23 and 25–27 differ from each other only in the recitation of these same conventional elements. As indicated by the prior art applied in the final rejection and on this appeal, applicants have merely added well-known structures to perform their known functions."

Supplementary to the reasons assigned by the examiner, the board stated:

" * * * Admitting that the specific designs of the various cams, levers, linkages, stops, governors, etc. require great care and consideration, none of the appealed claims are directed to such specific designs but merely set forth the various means, broadly, with functional limitations as to their general control and broadly what they do. Attention is directed to claims 3 and 40 copied hereinabove as being illustrative. For instance each of these claims include "means" responsive to entering air pressure for modifying the valve opening but does not specify whether increase of pressure increases or decreases the valve opening. Further, we see no material distinction between a 'means' responsive to entering air pressure (claim 3), a "means" responsive to entering air temperature (claim 4) or a 'means' responsive to entering air pressure and temperature (claim 5), particularly since the 'means' may be the same in each case as suggested by bellows 92′ of Kunz."

In support of their contention that In re Chandler, supra, is not apposite here, appellants seek to distinguish that case from the case at bar on a factual basis. It is asserted that this distinction resides mainly in the fact that Chandler embraced fifty claims divided about evenly between method and apparatus claims, each divided into ten categories comprising broad and narrow claims, while in the instant case thirty-eight claims are presented, all for apparatus, defining a different combination of elements involving a far more complex invention.

In Chandler the patent sought was for an automatic control for jet engines predicated on fifty claims. We agree with appellants that the instant matter presents a more complex situation. Certainly the invention claimed and those disclosed by the references are not simple. The gravamen of complexity resides, however, not in the subject matter of the invention but in the volume of claims and the repetitious pyramiding of "means" and "elements" which tend more "to confuse rather than define" the invention. While many of the claims are couched in different language involving

varying phrases, they are not different in material substance. Groups of them employ repetitious recitation of conventional elements. With a difference in phraseology, some of them call for the same combination of elements.

We are constrained to agree with the examiner and the board as to the examples pointed out in reference to claims which do not materially differ from each other.

Appellants' contention here is very similar to that made by appellant in the Chandler case in which the court held that the alleged complexity of the specific apparatus afforded no basis for an excessive number of claims. The court stated:

"As was pointed out in In re Barnett, 155 F.2d 540, 33 C.C.P.A. Patents, 1119, it is proper to allow applicants a reasonable latitude in setting forth their inventive concepts in different phraseology, but it is the purpose of claims to point out and define what an applicant regards as his invention, and that purpose is not served if, as the result of frequent repetitions, they present to the mind a blur rather than a definition."

 We are in accord with the view that applicants should be allowed reasonable latitude in stating their claims in regard to number and phraseology employed. The right of applicants to freedom of choice in selecting phraseology which truly points out and defines their inventions should not be abridged. Such latitude, however, should not be extended to sanction that degree of repetition and multiplicity which beclouds definition in a maze of confusion. The rule of reason should be practiced and applied on the basis of the relevant facts and circumstances in each individual case.

It is our opinion that the record in the instant case clearly supports the decision of the board on the issue of undue multiplicity. In re Chandler is, in our opinion, apposite and controlling.

It appears that claims 24, 37 and 38, which were rejected only on the ground of undue multiplicity, are patentable in the absence of the other thirty-five claims which were rejected on prior art.

For the reasons stated, we affirm the decision of the Board of Appeals rejecting claims 3 to 17, 19 to 23, 26 to 33, 35, 36 and 39 to 43 on prior art. We further affirm the decision of the board rejecting all of the claims on appeal as unduly multiplied.

Affirmed.

MARTIN, J., did not participate in decision.